IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

JAN 2 3 2012

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | CRIMINAL NO:  1:12MJ33 |
| - v. - | ) | |
| | ) | |
| JOHN KIRIAKOU, | ) | |
| | ) | |
| Defendant. | ) | |

## AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINT AND ARREST WARRANT

I, Joseph Capitano, being duly sworn, depose and state the following:

1.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have been employed with the FBI since approximately 2004.  I am currently assigned to a squad at the Washington, DC Field Office that handles national security cases.  During my tenure with the FBI, I have handled federal criminal investigations and the execution of numerous arrest warrants.

2.     This affidavit is submitted in support of a criminal complaint alleging that JOHN KIRIAKOU has committed violations of Title 18, United States Code, Sections 793(d) and 1001(a)(1), and Title 50, United States Code, Section 421(b).  Because this affidavit is being submitted for the limited purpose of establishing probable cause for the accompanying complaint, I have not included each and every fact known to me concerning this investigation.

1

3.  This affidavit is based on my personal knowledge; information provided to me by other law enforcement agents and other government personnel; and my review of documents and other materials.

## Background

### The Matter Under Investigation

4.  On or about January 19, 2009, defense counsel for certain high value detainees held at the United States military detention facility at Guantanamo Bay, Cuba, filed a motion with the military commission then responsible for adjudicating charges brought against the detainees, seeking permission to obtain information that counsel contended was necessary to further the defense of the detainees. In support of this motion, defense counsel filed a classified document under seal (the "classified defense filing"), which named or otherwise identified multiple persons whom defense counsel believed to be United States government personnel involved in classified activities relevant to the legal defense of the detainees. The classified defense filing contained both accurate and inaccurate information relating to the identity and affiliation of the individuals described in the document, as well as to activities in which they participated. Certain of the accurate information contained in the classified defense filing included the names and affiliation of covert United States government personnel, as well as information about persons whose affiliation with the United States government was not classified but whose participation in certain activities was classified.

5.     Based on consultation with the Department of Defense and a review of discovery provided to defense counsel prior to January 19, 2009, there had been no authorized disclosure to defense counsel of the classified information that was contained in the classified defense filing relating to the identities and activities of covert government personnel.

6.     In spring 2009, 32 pages of photographs were discovered in the possession of certain high value detainees held at the United States military detention facility at Guantanamo Bay, Cuba.  Among these photographs were photographs of certain personnel of the Central Intelligence Agency ("CIA") and the FBI and federal government contractors.

The Initiation of the Investigation and Appointment of Special Attorneys

7.     After reviewing the January 2009 classified defense filing (and prior to the discovery of the photographs), the CIA filed a crimes report on March 19, 2009, with the Department of Justice.  The National Security Division of the Department of Justice, working with the FBI, commenced an investigation.

8.     By letter dated March 8, 2010, Patrick J. Fitzgerald, the United States Attorney for the Northern District of Illinois, was appointed Special Attorney to supervise the investigation pursuant to Title 28, United States Code, Section 515, subject to the supervision of the Deputy Attorney General.

9.     The March 8, 2010 letter, as supplemented and amended on July 14, 2010 and clarified by letter dated May 27, 2011, delegates authority to conduct an

investigation and any related prosecutions in connection with any matter arising out of the Department of Defense seizures of certain photographs from Guantanamo Bay detainees.

The Conduct of the Investigation

10. The investigation focused initially on the circumstances surrounding the inclusion in the classified defense filing of information concerning covert government personnel, and the possession of photographs of government personnel by detainees. After independently examining the facts and circumstances surrounding the filing of the classified document in January 2009 and the recovery of the photographs in spring 2009 -- a process that included obtaining information from the defense team and interviewing the defense investigator under procedures designed to avoid infringement of the detainees' ability to consult with counsel and the attorney-client privilege -- the investigative team concluded that no laws were broken by the defense team. In particular, no law prohibited defense counsel from filing a classified document under seal outlining for a court classified information they had learned during the course of their investigation. With respect to the photographs taken or obtained by the defense team in the course of their investigation and provided to detainees, the investigative team found no evidence the defense attorneys transmitting the photographs were aware of, much less disclosed, the identities of the persons depicted in particular photographs or otherwise disclosed any classified matters associated with certain of those individuals to the detainees. Rather, the investigative team learned from the

defense investigator that defense counsel, using a technique commonly known as a double-blind photo lineup,[1] provided the photographs (which included photographs of non-pertinent people not affiliated with the government) to their clients to determine whether they recognized persons who may have participated in the questioning of them. No law or military commission order expressly prohibited defense counsel from providing their clients with the photographic spreads in question under these circumstances. However, the fact that a defense investigator had learned the classified information, including the information necessary to take and/or assemble these photographs, suggested that the information may have been either deliberately or inadvertently disclosed, without authorization, in a manner that ultimately resulted in the defense team's possession of the classified information.

11. Although the investigative team determined that members of the defense team did not break any laws in connection with their handling of the classified information they possessed relating to government personnel, the question remained whether government officials illegally disclosed the classified information that the defense team possessed. Further investigation led to the discovery that a former CIA employee, defendant JOHN KIRIAKOU, repeatedly made unauthorized and illegal disclosures of classified information to persons,

---

[1] Photographs in a "double-blind" photo lineup are not accompanied by any additional identifying information (such as names) so that both (1) the individuals who are shown the photographs and (2) the person(s) presenting the photographs are unaware of the identities of the persons depicted.

including reporters, not authorized to receive classified information, including information identifying a covert CIA employee and disclosing the participation of certain other CIA employees in classified activities. The investigation revealed that on multiple occasions, one of the reporters to whom KIRIAKOU illegally disclosed classified information in turn disclosed that information to the defense investigator, and that such information was reflected in the classified defense filing and enabled the defense team to take or obtain surveillance photographs of government personnel.[2]

12.    In particular, and as set forth in more detail below, the investigation revealed that:

a.    KIRIAKOU disclosed to a journalist the name of a covert CIA employee ("Covert Officer A") and the fact that this covert employee was involved in a particular classified operation.    The journalist then provided the defense investigator with the name of the covert CIA employee.

b.    KIRIAKOU disclosed or confirmed to three different journalists the then-classified information that another CIA employee ("Officer B") participated in an operation to capture and question terrorism subject Abu Zubaydah, and

---

[2] The investigative team learned from the defense investigator that the defense team did not photograph any persons whose association with the government was not public unless the defense team believed that the person was physically present for the questioning of a high value detainee and was not covert at the time of the defense investigation. Thus, for a number of the persons named in the classified defense filing whose association with the government was classified, no photographs were taken.

provided two of those journalists with contact information for Officer B. One of the journalists to whom KIRIAKOU provided information linking Officer B to the Abu Zubaydah operation, including a personal email address for Officer B, subsequently provided the defense investigator with Officer B's home telephone number, which the investigator used to identify and photograph Officer B.

      c.     KIRIAKOU lied to the CIA regarding the existence and use of a classified technique in an unsuccessful effort to trick the CIA into allowing him to publish information regarding the classified technique in a book.

## JOHN KIRIAKOU

13.     At times material to the allegations contained in this Complaint:

      a.     JOHN C. KIRIAKOU, the defendant, a United States citizen, resided in Arlington, Virginia.

      b.     From in or about 1990 through in or about 2004, KIRIAKOU was employed as an intelligence officer with the CIA. During his employment with the CIA, KIRIAKOU served at CIA Headquarters in Langley, Virginia, and in various classified overseas assignments.

      c.     In his capacity as an intelligence officer at the CIA, KIRIAKOU received security clearances enabling him to access classified information, as defined by Executive Order 12356, as superseded by Executive Order 12958 and amended by Executive Order 13292 (the "Order").[3]

---

[3] The Order mandates that information requiring protection for national security reasons be classified at one of three levels: "Top Secret," "Secret," or

## Non-Disclosure Agreements

14.     As described further below, on multiple occasions, KIRIAKOU executed agreements with the United States government not to disclose classified information to unauthorized persons.

15.     On or about January 10, 1990, in connection with the beginning of his employment, KIRIAKOU executed the following two agreements:

a.      KIRIAKOU signed a Secrecy Agreement with the CIA, in which he agreed as follows:

> 1. I . . . hereby agree to accept as a prior condition of my being employed by, or otherwise retained to perform services for, the Central Intelligence Agency . . . the obligations contained in this agreement.

> 2. I understand that in the course of my employment . . . I may be given access to information or material that is classified or is in the process of a classification determination . . . that, if disclosed in an unauthorized manner would jeopardize intelligence activities of the United States Government.   I accept that by being granted access to such information or material I will be placed in a position of special confidence and trust and become obligated to protect the information and/or material from unauthorized disclosure.

---

"Confidential."    The designation "Top Secret" applies to information, the unauthorized disclosure of which reasonably could be expected to cause exceptionally grave damage to national security.  The designation "Secret" applies to information, the unauthorized disclosure of which reasonably could be expected to cause serious damage to national security.   The designation "Confidential" applies to information, the unauthorized disclosure of which could be expected to cause damage to national security.   Finally, the Order provides that access to classified information at any level may be further restricted through compartmentation in "Sensitive Compartmented Information" ("SCI") categories.

3. In consideration for being employed or otherwise retained to provide services to the Central Intelligence Agency, I hereby agree that I will never disclose in any form or any matter, to any person not authorized by the Central Intelligence Agency to receive it, any information or material . . . that I know is classified . . . or is in the process of a classification determination.

. . .

11. I understand that . . . the disclosure of information that I agreed herein not to disclose can, in some circumstances, constitute a criminal offense.

. . .

15. I understand that nothing in this agreement limits or otherwise affects any provision of criminal or other law that may be applicable to the authorized disclosure of classified information, including . . . section[] 793 . . . of Title 18, United States Code . . . .

b. At the same time, KIRIAKOU executed a Non-Disclosure

Agreement in order to have access to certain SCI. KIRIAKOU agreed as follows:

Intending to be legally bound, I hereby accept the obligation contained in this Agreement in consideration of my being granted access within Special Access Programs, hereinafter referred to in this Agreement as Sensitive Compartmented Information (SCI). I have been advised that SCI involves or derives from intelligence sources or methods and is classified . . . . I understand and accept that by being granted access to SCI, special confidence and trust shall be placed in me by the United States Government.

I hereby acknowledge that I have received a security indoctrination concerning the nature and protection of SCI, including the procedures to be followed in ascertaining whether other persons to whom I contemplate disclosing this information have been

approved for access to it, and that I understand those procedures. . . . .

I have been advised that unauthorized disclosure, unauthorized retention, or negligent handling of classified information by me could cause irreparable injury to the United States or could be used to advantage by a foreign nation. I hereby agree that I will never divulge anything marked as SCI or that I know to be SCI to anyone who is not authorized to receive it without prior written authorization from the United States Government Department or agency . . . that last authorized my access to SCI. I understand that it is my responsibility to consult with appropriate management authorities in [the agency] that last authorized my access to SCI, whether or not I am still employed by or associated with [the agency] . . . .

In addition, I have been advised and am aware that any unauthorized disclosure of SCI by me may constitute a violation or violations of United States criminal laws, including the provisions of . . . . Section[] 793 . . . [of] Title 18, United States Code. . . .

16. Subsequently, KIRIAKOU signed not fewer than seven additional Non-Disclosure Agreements in order to access additional SCI, including the compartments covering certain classified information described in this Complaint. In each of these agreements, KIRIAKOU agreed never to disclose SCI to anyone not authorized to receive it without prior written authorization from the United States government.

### Unauthorized Disclosures Relating to Covert Officer A

17. Covert Officer A is currently a covert CIA employee whose relationship to the CIA has been classified for more than two decades. As set forth below, based on emails recovered from search warrants served on two email accounts associated

with KIRIAKOU, KIRIAKOU disclosed Covert Officer A's identity and certain classified information concerning his intelligence activities to Journalist A. Journalist A was not a person authorized by the United States government to receive classified information.

18. On July 11, 2008, KIRIAKOU exchanged a series of email communications with Journalist A.[4] Journalist A emailed KIRIAKOU to ask, "Can you remember the name(s) of any of the [specific CIA office] branch chiefs?" KIRIAKOU replied, "Sorry, [first name of Journalist A]. I never met any of those guys. And we never, ever dealt with them in [overseas city]." Journalist A responded twice to the same email. First, Journalist A replied, "Presumably, [first name of Covert Officer A]." KIRIAKOU then confirmed that "[h]e had been my branch chief in [specific office,] [b]ut he's the only one I ever came into contact with." Second, Journalist A asked, "Presumably [first name of Covert Officer A] worked in that group though, right?" KIRIAKOU replied separately to this email, stating, "I assume he did. And actually, I'm not sure he was the chief of it. He was the team leader on [specific operation], though."

19. In the afternoon of August 18, 2008, Journalist A emailed KIRIAKOU, asking him to "pick out [first name of Covert Officer A]'s last name" from a list of names that Journalist A provided in the email. In the same email, Journalist A

---

[4] Emails quoted below are verbatim insofar as possible and preserve the original language and style, including errors. Redactions are noted in brackets and described based on context and the affiant's training, experience, and knowledge of the investigation as a whole. The quotations are excerpts only and do not necessarily include the entire email or entire email chain.

stated, "I'm not sure he's still in [particular country], but maybe's he's on this list I've pulled." The following morning, at 9:23 am, KIRIAKOU wrote back, stating, "[first and last name of Covert Officer A]. It came to me last night." The last name of Covert Officer A had not been on the list provided by Journalist A.

20.     At 11:31 a.m. on August 19, 2008, approximately two hours after KIRIAKOU disclosed Covert Officer A's last name to Journalist A, Journalist A sent an email to the defense investigator referenced above that contained Covert Officer A's full name in the subject line. The email further stated: "His name is [first and last name of Covert Officer A]." At 1:35 p.m., Journalist A sent a final email to the defense investigator in which he stated: "my guy came through with his memory." Neither Journalist A nor any other journalist to my knowledge has published the name of Covert Officer A.

21.     At the time of the unauthorized disclosure, the identification of Covert Officer A as "the team leader on [specific operation]" was classified at the Top Secret/SCI level because it revealed both Covert Officer A's identity and his association with the CIA's Rendition, Detention, and Interrogation Program (the "RDI Program"), relating to the capture, detention, and questioning of terrorism subjects. This information had been closely held by the United States government.

22.     Before Journalist A provided the defense investigator with Covert Officer A's name, the defense investigator had been attempting to identify Covert Officer A for some time but had been unable to do so. It was only after receiving

Covert Officer A's name from Journalist A that the defense investigator was able to identify Covert Officer A.

23.     Both Covert Officer A's name and association with the RDI Program were included in the January 2009 classified defense filing.   The defense investigator has advised the government that he understood from the circumstances that Covert Officer A was a covert employee and, accordingly, did not take his photograph.  No photograph of Covert Officer A was recovered at Guantanamo.

24.     On April 8, 2009, KIRIAKOU again exchanged email communications with Journalist A concerning Covert Officer A.  Specifically, at 2:14 p.m., Journalist A emailed KIRIAKOU and asked, "Ever know a [name] in [specific CIA office]?"  At 3:09 p.m., KIRIAKOU responded to Journalist A and stated, "Sorry, [first name of Journalist A].  I didn't know the [specific office] people by name except for [first name of Covert Officer A]."  At the time of this additional disclosure, the association of Covert Officer A with the specific office remained classified at the Top Secret/SCI level because, as described above, it revealed both Covert Officer A's identity and his association with the RDI Program.

### Unauthorized Disclosures Relating to Officer B

25.     At times material to this Complaint:

a.     Officer B was employed at the CIA as an analyst assigned to its CounterTerrorism Center.

b.     In or about March 2002, Officer B worked overseas with KIRIAKOU on an operation to locate and capture Abu Zubaydah, a terrorism

subject then sought by the United States government (the "Abu Zubaydah operation"). The participation of Officer B in the operation was classified.

26. According to a CIA classification review officer, both Officer B's association with the RDI program, and the Abu Zubaydah operation in particular, were classified until that information recently was declassified in order to allow this prosecution to go forward.

27. As described in further detail below, based on information I have obtained from other individuals involved in this investigation, I have learned that KIRIAKOU disclosed classified information regarding Officer B, a former employee of the CIA with whom KIRIAKOU had worked at the CIA, to individuals who were not authorized by the United States government to receive the classified information. Specifically, and as more fully described below, based on emails recovered from search warrants served on two email accounts associated with KIRIAKOU, I have learned that KIRIAKOU disclosed or confirmed to at least three journalists classified information regarding Officer B. In two instances, these disclosures took the form of confirming for journalists that a specific individual with Officer B's name was the individual who participated in certain clandestine activity, namely the Abu Zubaydah operation, including by providing contact information for that individual; in the third instance, KIRIAKOU appears to have described to a journalist Officer B's classified role in the Abu Zubaydah operation.

## Disclosures About Officer B to Journalist B

28.    On June 22, 2008, <u>The New York Times</u> published an article by one of its own reporters ("Journalist B") entitled "Inside the Interrogation of a 9/11 Mastermind" (the "Article"), which publicly named and identified Officer B and reported about Officer B's alleged role in the capture and questioning of Abu Zubaydah. The fact that Officer B participated in the capture and questioning of Abu Zubaydah was then classified.    The Article stated that "colleagues" had described Officer B's role, that Officer B had declined to be interviewed, and that the CIA Director and an attorney for Officer B had requested that Officer B not be named. The article attributed other information to KIRIAKOU as a source, but did not identify the source(s) who disclosed or confirmed Officer B's identity.

29.    As discussed further below, there is probable cause that, at various times prior to June 22, 2008, KIRIAKOU provided Journalist B with personal information regarding Officer B knowing that Journalist B was seeking to identify and locate Officer B in light of Officer B's role in the Abu Zubaydah operation. In doing so, KIRIAKOU confirmed that Officer B was involved in the Abu Zubaydah operation and therefore disclosed classified information. Journalist B was not a person authorized by the United States government to receive classified information.

30.    For example, prior to the publication of the Article, KIRIAKOU emailed Officer B's phone number and email address to Journalist B. In an email dated April 21, 2008, Journalist B informed KIRIAKOU that he "[d]rove around Va

yesterday in the rain and stopped by [first name of Officer B]'s house. I couldn't figure it out -- two big dogs in the house, but no one around and a newspaper dated April 9 in front of the door. Also, the cell number on his [business] card seems not to work. Any further suggestions on how to find him most welcome . . . ." In an email sent later the same day, KIRIAKOU replied: "As for [first name of Officer B], I don't know what to make of it. The numbers I have are [phone number] (home) and [phone number] (cell). Is that what I gave you from the business card? His email is [Officer B's personal email address]. It's very odd that the dogs were barking and that old paper was out. . . . Please let me know if I can be of any further help." The contact information was accurate, and in one or more interviews conducted by agents, Officer B recalled Journalist B attempting to reach him.

31.     Based on interviews of Officer B by other agents, I have also learned that, prior to the publication of the Article, Journalist B attempted to contact Officer B in person, by phone, and by email, among other means:

a.     Journalist B had visited Officer B's home on a Sunday,[5] leaving notes under his door and in his mailbox and parking outside his house for almost four hours.

b.     On or about May 8, 2008, an individual identifying himself as Journalist B called Officer B's home and spoke with his wife.

---

[5] As noted in Journalist B's email to KIRIAKOU, dated April 21, 2008, and described in paragraph 30 above, Journalist B had visited Officer B's home the day before the email was sent. April 20, 2008 was a Sunday.

c.     On or about April 11, 2008, and May 8, 2008, Journalist B emailed Officer B at his personal email address.     Officer B had provided his personal email address to KIRIAKOU, but not to Journalist B or any other journalist.

d.     At various times prior to the publication of the Article, Journalist B also contacted Officer B's mother, sister, and a high school friend.

32.     Subsequently, KIRIAKOU also confirmed for Journalist B that an individual with Officer B's name who was associated with particular contact information that Journalist B had found on a website was located in Pakistan in March 2002, which were the country and the month, respectively, in which the Abu Zubaydah operation took place.     In an email dated May 29, 2008, Journalist B provided KIRIAKOU with contact information for Officer B, who was listed on the website as "[first and last name of Officer B]," and also included the web link to the information.     The information reflected that "3/9/02" was when the website received the information, i.e., the "Date Received."     KIRIAKOU replied, "What an odd link this is!     He was DEFINITELY in Pakistan when he did this."[6]     This communication establishes probable cause that KIRIAKOU confirmed for Journalist B that the individual whom Journalist B sought to identify was the same individual who had worked in Pakistan when the Abu Zubaydah operation took place.     In doing so,

_____

[6] Although the website reflects that the information was received on March 9, 2002, Officer B stated that no entry was made from overseas at that time.     It is unknown whether the date reflects an actual entry or, for example, an automatic update on the website.

KIRIAKOU also confirmed for Journalist B that Officer B was associated with the Abu Zubaydah operation, thereby revealing classified information.

33. After the publication of the Article, KIRIAKOU sent several emails denying that he was the source for information in the Article regarding Officer B, while, at the same time, lying about the number and nature of his contacts with Journalist B. For example, in an email dated June 30, 2008, KIRIAKOU stated to Officer B: "I had a conversation over the weekend with the ombudsman at the New York Times regarding the article about you in last week's paper. . . . I told the ombudsman that I thought the use of your name in the article was despicable and unnecessary, and that I thought it could put you in personal danger. . . . I also wanted to let you know . . . that I did not cooperate with the article. My only contact with the author was three days before the article was published. He called me and asked if we could talk. I declined. He then asked if I thought he should mention you by name. I said absolutely not. He countered with the fact that you have not been under cover. I said that made no difference, and that while it might not be illegal to name you, it would certainly be immoral." However, as reflected in the emails described above, KIRIAKOU was in contact with Journalist B by email on a number of occasions and provided Journalist B with information about Officer B.

<u>Disclosures About Officer B to Journalist A</u>

34.   From at least in or about November 2007 through in or about November 2008, KIRIAKOU provided Journalist A with Officer B's personal contact information and disclosed to Journalist A classified information revealing Officer B's association with the RDI Program.

35.   In an email dated November 12, 2007, KIRIAKOU provided Journalist A with Officer B's personal email address.  Subsequently, and on at least two occasions, KIRIAKOU provided information to Journalist A regarding Officer B's association with the RDI program:

   a.   First, in an email dated May 17, 2008, Journalist A asked KIRIAKOU: "In [Country X] and then in [Country Y], was [first name of Officer B with two letters transposed] trained to do the techniques, or was he just asking the questions as the heavies were doing the various techniques," referring to enhanced interrogation techniques.  In an email dated May 20, 2008, KIRIAKOU responded to Journalist A and disclosed Officer B's classified association with the RDI Program, noting:   "[First name of Officer B] was not trained in the enhanced techniques. He was simply there to ask the questions that the analysts had posed."

   b.   Subsequently, in a series of emails beginning November 12, 2008, Journalist A asked KIRIAKOU about classified information regarding the logistics of travels by participants in the RDI program, including Officer B.  For example, on November 12, 2008, Journalist A asked KIRIAKOU: "[D]id [first name of Officer B with two letters transposed] ever tell you how he actually got to

[Country X] and [Country Z]?" In response, on November 17, 2008, KIRIAKOU stated, among other things, "Re [first name of Officer B], he did not [travel in a certain way]," thereby confirming Officer B's participation in the RDI program.

36. As referenced above at paragraph 10, the investigative team interviewed an investigator assisting the defense team representing one or more high value detainees being held at Guantanamo (the "defense investigator"). Based on that interview, I have learned that Journalist A provided information about Officer B to the defense investigator. For example, in an email dated April 10, 2008, Journalist A provided the defense investigator with Officer B's home phone number.[7] Before Journalist A provided Officer B's phone number to the defense investigator, the defense investigator had been unable to accurately identify Officer B, particularly in light of his common surname. However, after receiving this information, the defense investigator was able to quickly and accurately identify Officer B and photograph him.

37. Four photographs of Officer B were included in the packet of photographs recovered at Guantanamo.

---

[7] Although the emails between KIRIAKOU and Journalist A do not reflect that KIRIAKOU provided Journalist A with Officer B's home telephone number, the email traffic between KIRIAKOU and Journalist A reflects that KIRIAKOU provided Journalist A with other information about Officer B and his activities with the CIA. In addition, the home telephone number for Officer B that Journalist A provided to the defense investigator was the same home phone number that KIRIAKOU provided to Journalist B, as set forth in paragraph 30 above.

38. Both Officer B's name and his association with the RDI Program were included in the January 2009 classified defense filing.

Disclosures About Officer B to Journalist C

39. At some time prior to May 22, 2007, KIRIAKOU disclosed to Journalist C classified information regarding the association of Officer B with the Abu Zubaydah operation. It appears that KIRIAKOU and Journalist C collaborated on a preliminary book proposal.[8] This is reflected in an email dated May 22, 2007 from Journalist C to KIRIAKOU, attached to which was a book proposal that included information apparently provided originally by KIRIAKOU to Journalist C, regarding the role of KIRIAKOU in the capture of Abu Zubaydah. The book proposal also referenced Officer B by name and described purported actions that Officer B took in Pakistan with respect to the Abu Zubaydah operation. While aspects of the book proposal's description of Officer B's role in the operation may have been fictionalized, the information nevertheless disclosed classified information by specifically linking Officer B to the Abu Zubaydah operation.

40. Journalist C was not a person authorized by the United States government to receive classified information.

**False Statement to the CIA**

41. As described further below, the investigation also has revealed that KIRIAKOU lied to the CIA regarding a classified investigative technique (the

---

[8] Journalist C is not the coauthor of the book KIRIAKOU eventually published that is referenced in paragraph 42 below.

"technique") in an attempt to trick the CIA into allowing him to publish information regarding the technique in a book.

42. KIRIAKOU authored a book, <u>The Reluctant Spy: My Secret Life in the CIA's War on Terror</u>, by John Kiriakou with a coauthor, which Random House published in approximately 2009 (the "book").[9] The book purports to describe KIRIAKOU'S work on behalf of the CIA. Prior to the publication of the book, KIRIAKOU submitted multiple draft manuscripts of the book to the CIA's Publication Review Board ("PRB"),[10] which reviewed the draft manuscripts for classified information.

43. As reflected in a transcript of a recorded interview conducted in or about August 2007 to assist KIRIAKOU's coauthor in drafting the book, KIRIAKOU described to his coauthor the technique, which KIRIAKOU referred to as the "magic box," and informed his coauthor that the CIA had used the technique in the Abu Zubaydah operation.[11]

---

[9] Based on our investigation, I believe KIRIAKOU's coauthor currently is a freelance book writer, whom KIRIAKOU hired to assist KIRIAKOU with drafting and editing the book.

[10] The PRB is a CIA office responsible for conducting classification review of materials that CIA employees and former employees prepare for publication or other use in the public domain. PRB clearance is required prior to the publication or other public use of such materials.

[11] The transcript was sent by email from the coauthor to KIRIAKOU, and was obtained by the government as a result of the search of one of KIRIAKOU's email accounts.

44. Subsequently, in the Article published in <u>The New York Times</u> on June 22, 2008, referenced above, the technique was disclosed and referred to as a "magic box."

45. In an email dated June 30, 2008, KIRIAKOU again described the technique to his coauthor and stated that he thought "at the time [using the technique] was a great idea, conceptually."

46. A few days later, in an email dated July 2, 2008, KIRIAKOU's coauthor informed KIRIAKOU, among other things, that he had "just finished 6,000-plus words over two chapters on the Abu Zubaydah episode, I'm wondering how much of this PRB will let us publish." A few hours later, KIRIAKOU responded to his coauthor, stating, among other things, that "I'm guessing they'll let us publish a good chunk of the Abu Zubaydah story. They objected to some of the details of the planning for the capture, but what I propose doing is telling them that we've fictionalized much of it (even if we haven't.)."

47. Approximately one month later, by letter dated July 28, 2008 (the "Letter"), KIRIAKOU submitted a draft manuscript of the book to the PRB (the "Draft Manuscript"). (The Letter and Draft Manuscript comprise the first submission made to the PRB since the email exchange between KIRIAKOU and his coauthor on July 2, 2008, described in paragraph 46 above.) In the Letter, KIRIAKOU sought permission from the PRB to include a description of the technique in the book by falsely claiming that the technique was fictional and that he had never heard of it before. Specifically, KIRIAKOU stated: "There is a

reference early in this chapter to a device called a 'magic box.' I read about this so-called device in a New York Times article. The information in that article was clearly fabricated, as we used no such device. I am unaware of any [such] device . . . As it is fictionalized, I believe it is unclassified." The Draft Manuscript described the use of the technique in the Abu Zubaydah operation.

48.    On August 17, 2008, KIRIAKOU sent to his coauthor a copy of the Letter, along with the Draft Manuscript, by attaching them to an email and, in the text of the email, admitted to his coauthor that KIRIAKOU had lied to the PRB in an attempt to include classified information in the book:

> Here you go, [first name of coauthor].  I laid it on thick.
> And I said some things were fictionalized when in fact
> they weren't.  There's no way they're going to go through
> years of cable traffic to see if it's fictionalized, so we might
> get some things through. Enjoy. John.

49.    By letter dated October 17, 2008, the PRB informed KIRIAKOU that it had reviewed the Draft Manuscript and that various pages of the Draft Manuscript, including the pages regarding the technique, contained classified information and that therefore KIRIAKOU could not include the information on those pages in the book.

50.    According to a CIA classification review officer, the information regarding the technique that KIRIAKOU included in the Draft Manuscript was classified until recently declassified in order to allow this prosecution to go forward.

## January 19, 2012 Interview of KIRIAKOU

51. On January 19, 2012, KIRIAKOU was interviewed by FBI agents. The interview was recorded. During the interview, when the agents informed KIRIAKOU that Covert Officer A's name was included in the classified defense filing, KIRIAKOU stated, among other things, "How the heck did they get him? . . . [First name of Covert Officer A] was always undercover. His entire career was undercover." KIRIAKOU further stated that he (KIRIAKOU) never provided Covert Officer A's name or any other information about Covert Officer A to any journalist and stated, "Once they get names, I mean, this is scary."

52.    When asked whether he considered Officer B's association with the Abu Zubaydah operation classified, KIRIAKOU stated, "Absolutely, absolutely." KIRIAKOU also denied providing any contact information for Officer B or Officer B's association with the Abu Zubaydah operation to Journalists A and B prior to the publication of the June 22, 2008 New York Times article.  When specifically asked whether he (KIRIAKOU) had anything to do with providing Officer B's name or other information about Officer B to Journalist B prior to the Article, KIRIAKOU stated, "Heavens no."

Joseph Capitano
Special Agent
Federal Bureau of Investigation


Sworn and subscribed to before me this 23rd day of January, 2012.


_____/s/_____
John F. Anderson
United States Magistrate Judge